NORA J. CHOROVER (Bar No. 547352)
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Fl.
Boston, MA  02114
Phone:     617-742-5800
Fax:        617-742-5858

Attorneys for Plaintiff
CLEAN WATER ACTION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CLEAN WATER ACTION,<br><br>                         Plaintiff,<br><br>          v.<br><br>ALLIED RECYCLING CENTER, INC.,<br><br>                         Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CLEAN WATER ACTION ("CWA") by and through its counsel, hereby alleges:

### INTRODUCTION

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal

Water Pollution Control Act, 33 U.S.C. § 1251, et seq. (the "Clean Water Act" or "the Act").

Plaintiff seeks declaratory judgment, injunctive relief, and other relief the Court deems appropriate

with regard to actions taken by Allied Recycling Center, Inc. ("Allied") which resulted in the

discharge of stormwater runoff from the Allied site into waters of the United States, in violation of

the Act.

2.      Activities that take place at industrial facilities, such as material handling and storage, are

often exposed to the weather.  As runoff from rain or snow melt comes into contact with these

materials, it picks up pollutants and transports them to nearby creeks, lakes, or wetlands. Stormwater pollution is a significant source of water quality problems for the nation's waters.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

4.     On August 21, 2009, plaintiff provided notice of defendant's violations of the Act, and of its intention to file suit against defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Acting Administrator of EPA Region I; the Commissioner of the Massachusetts Department of Environmental Protection ("DEP"); and to defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CWA's notice letter is attached as Exhibit A, and is incorporated by reference.

5.     More than sixty days have passed since notice was served on defendant and the state and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the Commonwealth of Massachusetts has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

6.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.  Pursuant to Local Rule 40.1(D)(1)(b), this case is properly assigned to the Eastern Division, because both parties are located in Massachusetts, and plaintiff is located within the Eastern Division.

## PARTIES

7.     Plaintiff CLEAN WATER ACTION ("CWA") is a nationwide non-profit public benefit corporation organized under the laws of the District of Columbia, with its main New England office located in Boston, Massachusetts.  CWA has approximately 50,000 members who live, recreate and work in and around waters of the Commonwealth of Massachusetts, including in Walpole, and in the vicinity of Cedar Swamp, and the Neponset River and its tributaries.  CWA is dedicated to

2

working for clean, safe and affordable water, the prevention of health-threatening pollution, the creation of of environmentally-safe jobs and businesses, and the empowerment of people to make democracy work.  To further these goals, CWA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.      Members of CWA reside in the Walpole area.  Members of CWA use and enjoy Cedar Swamp and the Neponset River and its tributaries and associated wetlands for recreation, sightseeing, wildlife observation and/or other activities in the vicinity of and downstream of defendant's discharges.  Members of CWA use and enjoy the waters into which defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CWA have a recreational, aesthetic and/or environmental interest in Cedar Swamp and the Neponset River and its tributaries.  The interests of CWA's members have been, are being, and will continue to be adversely affected by defendant's failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to plaintiff caused by defendant's activities.

9.      Continuing commission of the acts and omissions alleged above will irreparably harm plaintiff and the citizens of the Commonwealth of Massachusetts, for which harm they have no plain, speedy, or adequate remedy at law.

10.     Defendant ALLIED RECYCLING CENTER, INC. is a corporation organized under the laws of the Commonwealth of Massachusetts that operates a scrap recycling facility in Walpole.

## STATUTORY BACKGROUND

11.     Pollutant Discharges without a Permit are Illegal.  The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including the requirement that the discharge be permitted by the federal Environmental Protection Agency ("EPA") under the National Pollutant Discharge Elimination System ("NPDES").  Sections 301(a), 402(a) and 402(p) of the Act. 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

12.     EPA Has Made Stormwater Discharges from Scrap Recycling Facilities Subject to the Requirements of EPA's General Industrial Stormwater Permit.  In order to minimize polluted

stormwater discharges from industrial facilities, the federal Environmental Protection Agency has issued a general industrial stormwater permit ("General Industrial Permit"). EPA's General Industrial Permit was first issued in 1995, and was reissued in 2000 and 2008. See 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008). Scrap recycling facilities are subject to the requirements of this General Industrial Permit. See Stormwater Permit, Appendix D, pg. D-4. Scrap recycling facilities which carry on other types of activities also subject to the terms of the Stormwater Permit must also comply with any sector-specific requirements applicable to such co-located industrial activity. Stormwater Permit, pg. 97. Scrap recycling facilities may also apply for coverage under an individual permit. 40 CFR 122.26(c).

13.     Scrap Recycling Facilities Must Develop and Implement a Stormwater Pollution Prevention Plan (SWPPP). An owner or operator (hereafter referred to as "operator") of a facility subject to the requirements of the General Industrial Permit must prepare a SWPPP before applying to EPA for coverage under the General Industrial Permit. The SWPPP must be "prepared in accordance with good engineering practices," Stormwater Permit, pg. 17 (referring to "control measures"), and, among other things,

> *      identify potential sources of pollution at the facility;
> *      describe and ensure implementation of control measures that are technologically available and economically practicable and achievable in light of best industry practice;
> *      set forth specific procedures to assure compliance with effluent limitations and monitoring/inspection requirements of the Stormwater Permit.

See 40 CFR 122.26(c)(i); Stormwater Permit pgs. 12, 27-30.

14.     Scrap Recycling Facilities Must Submit to EPA a Notice of Intent to Be Covered by the General Industrial Permit By EPA's Established Deadlines. After completing and implementing its SWPPP, scrap recycling facilities must submit to EPA a Notice of Intent to be covered by the General Industrial Permit. EPA's initial NOI filing deadline was January 1, 1996. See 60 Fed. Reg. 50804. When the agency reissued the General Industrial permit in 2008, it reminded operators

of subject facilities that unpermitted stormwater discharges are "unauthorized," and ordered all subject facilities to file an NOI for the 2008 permit by January 5, 2009.  See Stormwater Permit, pg. 9 (unpermitted discharges from the facility will continue to be "unauthorized" unless allowed under the Stormwater Permit).  See also 40 C.F.R. §122.28(b)(2)(i) ("A discharger ... who fails to submit a notice of intent in accordance with the terms of the permit is not authorized to discharge ....").

15.    <u>Scrap Recycling Facilities Must Comply with the Terms of the General Industrial Permit</u>. The General Industrial Permit requires scrap metal facilities to, among other things:

      a.    ensure that stormwater discharges meet applicable water quality standards, *see* Stormwater Permit, pg. 16;

      b.    reduce and/or eliminate pollutants to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice, *see* Stormwater Permit, pg. 12;

      c.    implement specific best management practices set forth in the General Industrial Permit for scrap recycling facilities, *see* Stormwater Permit, pgs. 97-102;

      d.    monitor stormwater discharges for compliance with benchmark limitations applicable specifically to scrap recycling facilities, *see* Stormwater Permit, pg. 102;

      e.    report monitoring results to EPA by specified deadlines, *see* Stormwater Permit, pgs. 41-43;

      f.    comply with any additional state requirements, *see* Stormwater Permit, pgs. 140-141.

16.    <u>Citizens may bring action to enforce these requirements</u>.  Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 a day for each violation on before

January 12, 2009, *see* 33 U.S.C. § 1319(d), 69 Fed. Reg. 7121 (Feb. 13, 2004), and $37,500 per day

of violation for violations after that date. *See* 73 Fed. Reg. 75340 (Dec. 11, 2008).

## STATEMENT OF FACTS

17.     Defendant operates a scrap metal recycling facility at 1901 Main Street, Walpole, MA (the

"Site"). The Site falls within Standard Industrial Classification ("SIC") Code 5093 and includes

some operations within SIC code 5015. The Site covers more than ten acres, and is almost entirely

surrounded by wetlands. The Site includes a yard, office, and operations buildings and equipment.

Its operations include scrap metal recycling, processing and storage, as well as vehicle fueling,

dismantling, processing, storage and maintenance. The majority of scrap metal recycling,

processing and storage and vehicle dismantling and processing at the facility occurs outdoors.

Storm water coming into contact with the facilities discharges from various locations on the Site,

including to a stream at the southern end of the Site, and into portions of Cedar Swamp wetlands to

the west of the Site and other wetlands to the north of the Site. The wetlands and creeks adjacent to

the Site are connected to the Neponset River and/or its tributaries.

18.     Numerous activities at the Site take place outside and are exposed to rainfall. These

activities include, but are not limited to, stockpiling and storage of scrap metals, vehicles and other

materials, materials loading and unloading, scrap metal processing, vehicle dismantling, and vehicle

and equipment maintenance. Industrial machinery and heavy equipment, including trucks and fork

lifts, are operated, maintained, or stored at the Site in areas exposed to storm water flows.

19.     Among the sources of pollutants at the Facility are deteriorating and/or corroding stockpiled

metal materials. Other sources of pollutants include leaking fluids from various parts – including

used automotive engines, radiators, brake fluid reservoirs, transmission housings – and lead-acid

from batteries. Spills and leaks from equipment used to move materials around the Facility may

also occur. Pollutants that may be discharged to the storm drains include (but are not limited to)

PCBs, oil and grease, mercury from switches and lamps, lubricants, paint pigments or additives,

heavy metals, transmission and brake fluids, fuel, battery acid, lead acid, antifreeze, benzene,

heating oil, petroleum products, solvents, infectious/bacterial contamination, asbestos, total Kjeldal

nitrogen (TKN) oil wastes and chemical residue.  Clean Water Action believes that stormwater discharges from the Facility contain some or all of these pollutants.

20.    Storm water flows over the surfaces of the Site, collecting pollutants, and some of this stormwater discharges to a creek to the south of the Site and some discharges to wetlands adjacent to the Site, including wetlands to the west and to the north of the Site.

21.    The management practices at the Site are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Site lacks sufficient structural controls such as settling basins, grading, berming or roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants.  The Site lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Site lacks an adequate system, such as a filtration system, to treat water once contaminated.

## CAUSE OF ACTION
### Discharges of Contaminated Storm Water Without a Permit:
### Violations of 33 U.S.C. §§ 1311(a)

22.    Plaintiff re-alleges and incorporates Paragraphs 1-21, inclusive, as if fully set forth herein.

23.    Plaintiff is informed and believes, and thereupon alleges, that since at least Nov 13, 2004, defendant has been discharging polluted storm water from the Facility to Cedar Swamp and to other creeks and wetlands connected to the Neponset River, in violation of the Clean Water Act. Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

24.    During every rain event, rainwater flowing over exposed materials at the Facility becomes contaminated with pollutants. The rainwater then flows untreated from the Facility into Cedar Swamp, a wetland connected to the Neponset River and/or its tributaries, and into other wetlands connected to the Neponset River and/or its tributaries.

25.    The days during the last five years on which rain, snow melt or other factors caused stormwater to be discharged from the Site to US waters are listed on Exhibit B hereto.

26.    Every day since Nov 13, 2004 that defendant discharged and continues to discharge polluted storm water from the Facility in violation of the Federal Water Pollution Control Act is a

separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1.      Declare defendant to have violated and to be in violation of the Act as alleged herein;

2.      Enjoin defendant from discharging pollutants from the Facility and to the wetlands and surface waters surrounding and downstream from the Facility;

3.      Require defendant to implement the requirements of the General Industrial Permit;

4.      Order Defendant to pay civil penalties of $32,500 a day for each violation on before January 12, 2009, and $37,500 per day of violation for violations after that date;

5.      Order Defendant to take appropriate actions to restore the quality of wetlands and surface waters impaired by their activities;

6.      Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

7.      Award any such other and further relief as this Court may deem appropriate.


Dated:  November 13, 2009                   Respectfully submitted,


                                            _____Nora J. Chorover_____
                                            NORA J. CHOROVER (Bar No. 547352)
                                            Stern, Shapiro, Weissberg & Garin, LLP
                                            90 Canal Street, 5th Fl.
                                            Boston, MA  02114
                                            Phone: 617-742-5800
                                            Fax:    617-742-5858

                                            Attorneys for Plaintiff
                                            CLEAN WATER ACTION